Justin Wade GREEN *v.* STATE of Arkansas

95-1005                                916 S.W.2d 756

Supreme Court of Arkansas
Opinion delivered March 11, 1996
[Petition for Rehearing denied April 22, 1996.]

636

*Bridewell & Bridewell*, by: *Laurie A. Bridewell* and *Robert G. Bridewell*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Sandy Moll*, Asst. Att'y Gen., for appellee.

DAVID NEWBERN, Justice. Justin Wade Green turned 14 on August 4, 1994. On September 15, 1994, he telephoned the Monticello Police Department from his home. He was crying and pleading for help for his close friend, 13-year-old Jacob Stanley, who had been shot, as it turned out, fatally. Justin was charged with manslaughter in Drew Circuit Court. The portion of the manslaughter law with which he was charged reads, "A person commits manslaughter if: He recklessly causes the death of another person." Ark. Code Ann. § 5-10-104(a)(3) (Repl. 1993). He moved to transfer the case to juvenile court. The motion was denied on the grounds that the offense charged is

serious and a firearm was involved. We reverse and remand for transfer to the juvenile court.

Drew County Deputy Sheriff Cox, who participated in the police investigation of the incident, testified about the transcript of Justin's telephone call to the police and about the immediately ensuing investigation. Through somewhat garbled questions and answers with the operator, and later in a clearer manner to investigators, Justin related that he tried to get a television remote control device away from Jacob. Justin had his father's .357 magnum pistol. Jacob said, "What are you going to do, stupid, shoot me?" Justin replied, "No." Jacob threw the remote control device at Justin who dropped down to avoid being struck. The gun went off, wounding Jacob in the chest.

Although Justin's explanation, both in his initial call and later, was that the shooting was completely accidental, Deputy Cox related some circumstances raising doubts. The bullet entered Jacob's body in a downward path, making it seem unlikely, perhaps, that Justin had fallen and Jacob was standing upright when the shot occurred. Jacob was found lying on his back rather than on his side as Justin had reported his fallen position. The remote control device was near Jacob's body rather than near the place Justin said he had been when he went down to avoid being struck. Justin explained the latter two circumstances by saying he had kicked the remote control device across the room in anger at himself and had rolled Jacob over in an effort to help him. Although the path of the bullet in Jacob's body remained unexplained, there was no evidence as to the position of Jacob's body when the shot entered it.

There was evidence that Justin is fascinated with guns. He had been told not to play with his father's pistol, but friends testified that he often got it out when they were with him and his parents were not at home. He and the friends handled the gun. There was testimony that he once pointed it at his brother and said he was going to kill him but there was other testimony from young friends that they had not seen Justin point the gun at anyone when he was showing it to them.

Deputy Cox testified he had checked for any police record of misconduct on the part of Justin and found nothing to indicate he had ever had a problem with the law in Little Rock or North

Little Rock where he had previously lived or in his current home town, Monticello.

Justin's mother testified that he had never been in trouble with the law. She said Jacob had been Justin's best friend and they never quarreled or fought. Justin had maintained a 3.4 grade average in school prior to the incident. He was inducted into the Beta Club in honor of his good scholarship and citizenship. During the time he remained in school after the incident, his grades dropped to 2.4. He was suspended from school due to the felony charge. In his home schooling with which his mother helped him he achieved better than average scores on standardized tests. His mother testified that Justin suffered from nightmares after the shooting and that she and her husband and Justin had all received prescription medicines and psychological counselling as the result of the incident.

The psychological counselor Justin had visited some 50 times since the incident testified that the best course for Justin was to reintegrate him in school. He testified Justin had no problem requiring rehabilitation, such as a mental disorder or drug addiction, but that he continued to have crying spells and mental ups and downs resulting from the death of his friend. It was also related that Justin had struck another young man who taunted him about the incident and that he was the sort who did not back away from aggressive behavior toward him.

At the conclusion of the hearing on the motion to transfer, the Trial Court stated:

> I have listened to the testimony and among other things, as it was pointed out, that Justin is a violent person and there's two major factors I have given substantial consideration to. One is the seriousness of the offense and the other is a death caused by a firearm. These are the two primary factors that I've considered in deciding that this matter should be heard by the Circuit Court as opposed to juvenile court, although that does not mitigate the evidence of the type of person that Justin Green is. But under these circumstances the Court finds the Motion to Transfer should be denied.

The operative part of the Court's order was as follows: "That

due to the serious nature of the crime charged & the use of a firearm in the commission of the offense, the defendant's motions should be and are denied." The order, as prepared presumably by the prosecutor, included the words "and the employment of violence." Those words were crossed out with the deletion initialed by Justin's counsel apparently prior to the signing of the order by the Trial Court.

### 1. The statutory transfer factors

■ The General Assembly has established factors to be considered in deciding whether a charge against a juvenile should be transferred to the juvenile division of a chancery court. Although commission of a felony while armed with a firearm is a basis of concurrent jurisdiction of a circuit court over a juvenile, Ark. Code Ann. § 9-27-318(b)(2)(M) (Supp. 1995), it is not one of the factors to be considered in making the transfer decision. Arkansas Code Ann. § 9-27-318(e) (Supp. 1995) provides the factors to be considered as follows:

> In making the decision to retain jurisdiction or to transfer the case, the court shall consider the following factors:
>
> (1) The seriousness of the offense, and whether violence was employed by the juvenile in the commission of the offense;
>
> (2) Whether the offense is part of a repetitive pattern of adjudicated offenses which would lead to the determination that the juvenile is beyond rehabilitation under existing rehabilitation programs, as evidenced by past efforts to treat and rehabilitate the juvenile and the response to such efforts; and
>
> (3) The prior history, character traits, mental maturity, and any other factor which reflects upon the juvenile's prospects for rehabilitation.

■■ In making a transfer decision, a circuit court is not required to give equal weight to each of the statutory factors. *Ring* v. *State*, 320 Ark. 128, 894 S.W.2d 944 (1995); *Williams* v. *State*, 313 Ark. 451, 856 S.W.2d 4 (1993); *Hogan* v. *State*, 311 Ark. 262, 843 S.W.2d 830 (1992). The seriousness of an offense, when coupled with the employment of violence, is a suf-

ficient basis for denying a motion to transfer and trying a juvenile as an adult. *Sims v. State,* 320 Ark. 528, 900 S.W.2d 508 (1995); *Holland v. State,* 311 Ark. 494, 844 S.W.2d 943 (1993); *Wicker v. State,* 310 Ark. 580, 839 S.W.2d 186 (1992); *Slay v. State,* 309 Ark. 507, 832 S.W.2d 217 (1992); *Vickers v. State,* 307 Ark. 298, 819 S.W.2d 13 (1991); *Walker v. State,* 304 Ark. 393, 803 S.W.2d 502, *reh'g denied* 304 Ark. 402-A, 805 S.W.2d 80 (1991).

■ From the evidence before the Trial Court, it is apparent that consideration of factors (2) and (3), which were not mentioned by the Trial Court in comments from the bench or in the order, would favor transfer in this case. The focus thus must be upon the first factor. No doubt the offense charged is serious. Manslaughter is a class C felony. Ark. Code Ann. § 5-10-104(c) (Repl. 1993). If Justin were convicted he would be sentenced to imprisonment for not less than three nor more than ten years. Ark. Code Ann. § 5-4-401(a)(4) (Repl. 1993).

The question then is whether factor (1) may form the basis of refusal to transfer absent a finding that "violence was employed."

### 2. *"Whether violence was employed"*

■ The question is not whether violence occurred in the incident under consideration but whether the decision not to transfer the case can stand absent a finding that "violence was employed" by Justin Green. Jacob Stanley obviously died a most violent death. Although an information alone may be sufficient evidence of the serious and violent nature of the crime alleged to support an order denying the motion to transfer, *Cole v. State,* 323 Ark. 136, 913 S.W.2d 779 (1996); *Hamilton v. State,* 320 Ark. 346, 896 S.W.2d 877 (1995); *Tucker v. State,* 313 Ark. 624, 855 S.W.2d 948 (1993); *Vickers v. State, supra; Walker v. State, supra,* the information in this case does not allege the employment of violence.

■ Justin Green is charged with having "recklessly" caused Jacob Stanley's death. "Recklessly" is defined or described by Ark. Code Ann. § 5-2-202(3) (Repl. 1993) as follows:

A person acts recklessly with respect to attendant circum-

stances or a result of his conduct when he consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of a nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.

"To employ" means "to make use of." *Shorter Oxford English Dictionary*, p. 810 (1993). The State does not intend to prove that "violence was employed" by Justin toward Jacob Stanley, and the order of the Trial Court contains no such finding.

■ Seriousness alone is not a sufficient basis to refuse the transfer. *See Holmes* v. *State*, 322 Ark. 574, 911 S.W.2d 256 (1995). Thus, evidence in support of applying factor (1) to justify refusal to transfer is incomplete, and factors (2) and (3) weigh in favor of transfer. True, as mentioned above, the Trial Court need not have given equal weight to each of the statutory factors for deciding whether to transfer, but in this instance application of them, no matter how they are weighed, points decidedly toward juvenile court.

Reversed and remanded for orders consistent with this opinion.

JESSON, C.J., GLAZE, and CORBIN, JJ., dissent.

TOM GLAZE, Justice, dissenting. If "violence was not employed" in the commission of this alleged crime, I am mystified how Jacob Stanley died. The undisputed evidence at the pretrial transfer hearing was that Jacob's death resulted from a gunshot wound caused by a .357 pistol which was then in Justin Green's possession. After hearing the evidence, the trial judge concluded that, "due to the serious nature of the crime charged (manslaughter) and the use of a firearm in the commission of the offense," he should deny the request to transfer the matter to juvenile court. Because this court repeatedly has held that the seriousness of an offense, when coupled with the employment of violence, is a sufficient basis for denying a motion to transfer and trying a juvenile as an adult, we should affirm the trial court's ruling in this case. *See Sims* v. *State*, 320 Ark. 528, 900 S.W.2d 508 (1995); *Holland* v. *State*, 311 Ark. 494, 844 S.W.2d 943 (1993).

Other evidence presented below is troublesome and runs counter to the majority court's decision to overturn the trial judge's decision. Testimony was introduced that, prior to his having shot Jacob, Justin had on a previous occasion pointed a gun and threatened to shoot and kill his own brother. Evidence was also admitted, showing Justin had on numerous occasions displayed guns to friends, and his parents tried to hide the guns from him. One friend testified that Justin had taken all but one bullet from a gun and proceeded to pull the trigger of the gun, while aiming at a wall. The friend said, "I freaked out."

Finally, Deputy Sheriff Tommy Cox testified he had concerns over Justin's description of how the shooting occurred. Justin had stated the pistol discharged accidently after Jacob said, "What are you going to do stupid, shoot me?" Justin related he said, "No," and started to put the gun up. Then, Justin continued, "Jacob threw a remote [control], and I fell to the floor to keep the remote from hitting me — that's when the gun went off." Justin claimed Jacob fell on his right side, and had previously been standing. The on-scene investigation, however, found Jacob on his back and the remote lying next to his body. The autopsy revealed the bullet was in a downward trajectory in Jacob's body, which seemed inconsistent with Justin's story of his falling to the floor and Jacob standing.

From all the evidence above, it seems apparent that this court is substituting its judgment in place of the trial judge's. Clearly, the state provided sufficient evidence from which it could be concluded that Justin consciously and repeatedly risked other peoples' lives by wielding loaded guns in their presence. Unfortunately, Jacob was the one who was present when, on this occasion, Justin's reckless handling of a gun caused it to discharge and kill Jacob.

This is a sad case, but the trial judge made a difficult decision and I cannot say he was clearly erroneous.

JESSON, C.J., and CORBIN, J., join this dissent.