Cite as 2024 Ark. App. 393

# ARKANSAS COURT OF APPEALS
## DIVISIONS III & IV
**No.** CR-23-567

| | |
|---|---|
| LILLIAN HOUSELOG<br><br>                APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br><br>                APPELLEE | **Opinion Delivered:** June 5, 2024<br><br>APPEAL FROM THE SEVIER COUNTY CIRCUIT COURT<br>[NO. 67CR-22-174]<br><br>HONORABLE BRYAN J. CHESSHIR, JUDGE<br><br>REVERSED |

**MIKE MURPHY, Judge**

Appellant Lillian Houselog ("Lillian"), a seventeen-year-old with no criminal history, job, driver's license, or car, living with her adult boyfriend, his mother, and his adult brother, was charged as an adult with abuse of a corpse following her delivery of a live baby after ingesting "Plan C" abortion medication. Lillian filed a motion to transfer the case to the juvenile division of circuit court. After a hearing on the motion, the circuit court entered an order denying her motion to transfer. Lillian now appeals. On appeal, she argues that the circuit court clearly erred in denying her motion to transfer because the evidence was insufficient to support the circuit court's findings. We reverse.

It is within the prosecuting attorney's discretion to charge a juvenile in the criminal division of circuit court if the juvenile is sixteen years of age or older at the time of the conduct that, if committed by an adult, would be a felony. Ark. Code Ann. § 9-27-318(c)(1) (Repl. 2020). On the motion of the court or any party, the court in which the criminal

charges have been filed shall conduct a hearing to determine whether to transfer the case. Ark. Code Ann. § 9-27-318(e). The moving party bears the burden of proving that the case should be transferred to the juvenile division of circuit court. *Shaw v. State*, 2023 Ark. App. 55, 660 S.W.3d 55. The circuit court shall order that the case be transferred only upon a finding by clear and convincing evidence that the case should be transferred. Ark. Code Ann. § 9-27-318(h)(2).

At a juvenile-transfer hearing, the circuit court is required to consider all the factors set forth in Ark. Code Ann. § 9-27-318(g). The circuit court is required to make written findings on each factor. Ark. Code Ann. § 9-27-318(h)(1). However, there is no requirement that proof be introduced on each factor, and the circuit court is not obligated to give equal weight to each factor in determining whether a case should be transferred. *Heard v. State*, 2019 Ark. App. 586, 590 S.W.3d 215.

Our standard of review for juvenile-transfer cases states that we will not reverse a circuit court's determination whether to transfer a case unless the decision is clearly erroneous. *Walton v. State*, 2020 Ark. App. 318, 602 S.W.3d 754. "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court *on the entire evidence* is left with a definite and firm conviction that a mistake has been committed." *Id*. at 8, 602 S.W.3d at 758 (emphasis added). The denial of a juvenile-transfer motion is not clearly erroneous simply because some evidence might weigh in favor of granting the motion. *Shaw*, *supra*. On review, this court will not reweigh the evidence presented to the circuit court. *Id*.

2

After a thorough review of the entire evidence, we have a definite and firm conviction that a mistake has been committed.

*Factual Background*

On November 7, 2022, Sevier County Deputy Justin Richardson was dispatched to a home in Horatio, Arkansas, where he took a statement from Chloe Simmons. Chloe stated that earlier that day Lillian sent her a message in which she told her she had taken "Plan C" pills two days ago. Lillian also told her that she had the baby on the night of November 6, 2022, and that the baby was born alive and further along than she had expected. Lillian held the baby for approximately ten minutes, suctioned his mouth and nose, and clamped the cord. Despite Lillian's efforts to save him, the baby passed away. Lillian told Chloe that she wrapped the baby in a t-shirt, gave him to her boyfriend, Matthew, and asked him to "do the rest." After taking Chloe's statement, five officers went to Lillian's residence. The officers asked Lillian if she was pregnant; she responded that she had a miscarriage. Lillian was detained, and the officers noticed blood running down the back side of her pants as she was walking to the patrol car. On November 8, after getting a statement from Matthew, the officers found the baby's corpse wrapped in a plastic bag in a dumpster of the trailer park where Lillian and Matthew lived.

Lillian was detained without charges. On November 9 or 10, she was transported to the Juvenile Division of the Sevier County Circuit Court for a "First Appearance" and was ordered to remain in custody for an indeterminate period. On November 30, 2022, Lillian filed a motion for immediate release because her detainment exceeded the statutory limits set forth in Ark. Code Ann. § 9-27-313(f).

A hearing was held on the motion on December 1, 2022, and the circuit court suggested to the State that it could cure its failure to timely file a juvenile-delinquency petition by immediately filing a criminal information charging Lillian as an adult. The circuit court granted the State's request for a fifteen-minute recess, allowing the State to file its criminal information charging Lillian as an adult.

That day, Lillian was charged by criminal information with abuse of a corpse. On December 28, 2022, Lillian filed a timely motion to transfer the case to juvenile court under Ark. Code Ann. § 9-27-318.

At the juvenile-transfer hearing held on April 27, 2023, the circuit court first heard testimony from Lillian's father, Michael Houselog. Michael testified that he is a retired educator. He and his now ex-wife adopted Lillian when she was two years old, as well as her younger biological brother. Michael and his ex-wife raised the children in Poplar Grove, Illinois. Michael said that Lillian was an average student and had no major disciplinary issues in school. Lillian began high school in 2019, but at the start of her spring semester, the COVID pandemic forced her to take online classes. Michael said that this transition was harder on Lillian than most students. Simultaneously, Michael and his ex-wife were going through a divorce. During this time, when Lillian was fourteen years old, she met Matthew Hallmark in an online chat room.

In October 2020, Matthew and his cousin drove to Illinois from their home in Lockesburg, Arkansas. After her parents asked her not to go, Lillian, then fifteen years old, left Illinois and went to Arkansas with eighteen-year-old Matthew and his cousin. They lived with Rhonda Martz, Matthew's mother; her boyfriend, Pedro; and Matthew's two

brothers. After Rhonda and Pedro failed to pay rent, they were all evicted. Lillian, Matthew, and Matthew's older brother moved into a trailer. Rhonda and Pedro lived in a trailer next door for a period of time, and then Rhonda moved into the trailer with Lillian, Matthew, and Matthew's older brother prior to the date of the alleged crime.

In January 2021, Michael took both Lillian and Matthew back to Illinois where they alternated living with him and his ex-wife for three months. After this, Lillian returned to Arkansas with Matthew. Michael kept in touch with Lillian with one or two phone calls a week and frequent texting. He and his ex-wife also tracked her whereabouts using the GPS on her phone. Michael visited Lillian at least twelve times since leaving in October 2020. He said that he and his ex-wife always had the expectation that Lillian would come back, and he knew where she was at all times. When asked, "Mr. Houselog, does that not sound more like an adult child that a grown parent is going to visit sporadically in a state nine hours away? Than a 15-year-old child?" Michael responded, "I felt like I was parenting, and I felt like her mother was parenting."

Lillian continued attending school online when she moved to Arkansas, but when she chose to drop out of high school, Michael drove to Arkansas to meet with Leslie Daniels, the YouthBuild case manager at UA Cossatot, and enrolled her in the YouthBuild program, a GED and work-training program. She completed her GED in 2022, but, ultimately, she was asked to leave the program due to lack of participation. Michael was asked again whether he considered Lillian an adult who was living an independent life, to which he responded, "I have adult – other adult children and they don't live a similar life that she lives. So I would say the answer to that is no. It's not the same as my older children live. [.

. .] There was dependency on her mother and father for support, which is much more of an adolescent action than I would feel portrayed by your question."

Michael elaborated that he gave Lillian money cards and gifts. He paid her cell phone bill every month, and his ex-wife bought her clothes. That was as much financial support as they felt they could give her then.

Dr. Karla Fischer testified next. Dr. Fischer is a research-based psychologist whose specialization is the psychological effects of domestic violence. She met Lillian in February 2022, and through her meetings, she produced a report titled "Report of Childhood Trauma and Domestic Violence Evaluation."[1] Dr. Fischer opined that due to domestic violence by Matthew over the course of their two-year relationship, Lillian was less capable than a normal person to make decisions independently.

Matthew's mother, Rhonda Martz, testified about Lillian living with her family. When asked whether she had any involvement in that decision, Rhonda said no and that the decision was made by her parents. When asked if she was a parent to Lillian, Rhonda said, "No, I wasn't much of, you know, her guardian. She had parents already. She just lived with me and my sons." She said that, in general, Lillian was responsible and quiet but that it was stressful having her live with her family because they were already struggling financially, and it put a strain on them. Rhonda said, "I didn't want more responsibility, but I won't turn a kid away, you know."

---

[1]Dr. Fischer was qualified by the circuit court as an expert during the hearing; however, this report was not admitted as an exhibit. The circuit court sustained the State's objection to admitting the report because Dr. Fischer was present to testify about opinions made in the report.

Lillian never had a job in Arkansas, aside from occasional babysitting, and she never obtained her driver's license. Rhonda was responsible for Lillian's transportation. Rhonda said that her family was evicted from their home, and her older son got a trailer where he, Matthew, and Lillian moved in. Rhonda and Pedro lived in an RV next to the trailer during that time until Rhonda moved into the trailer with Matthew, Lillian, and Matthew's older brother. Again, there is no evidence in this record that Lillian contributed financially to the household in which she resided, whether it be rent, utilities, food, or any other necessities.

When asked whether she and Lillian ever had conflicts at home, Rhonda cited a heated and "cruel" text message that Lillian sent on a suspicion that Rhonda had been wearing Lillian's clothes. Rhonda said that Lillian's behavior prompted her to reach out to Michael Houselog for help. Regarding Lillian and Matthew's relationship, Rhonda said they would argue and break up but would eventually work it out. She said most of the fights stemmed from "drama" on social media, but overall, they were in "young love" and enjoyed their time together.

In January 2022, DHS caseworker Rachel Speights investigated a video posted on social media in December 2021 that was reported on the child-abuse hotline. The video allegedly showed Matthew hitting Lillian. During a home visit, Lillian explained to Speights that the video had been taken a month prior while they were camping and that she was the one who had hit Matthew. She was upset that Matthew was sitting next to another girl, but their friends separated them quickly and that ended the fight. Speights found alcohol and Swisher Sweets next to Lillian's bed and saw that Lillian's lips were gray and cracked due to excessive smoking.

Camille Stanley, a DCFS employee, also testified about this report. Lillian had been taken to DCFS where she spoke to Lillian about Michael's alleged abuse. There were concerns about who to release Lillian to after the investigation had ended. Because she was a minor, DHS could release Lillian only to a parent. Stanley contacted Michael Houselog to inform him that Lillian was in DCFS custody due to suspected neglect or abuse. Michael drove to West Memphis to pick Lillian up, and after questioning her about the incident, he inexplicably felt content to drive her back to Matthew's house in Arkansas rather than back to Illinois.

Leslie Daniels, the YouthBuild case manager at UA Cossatot, testified that Lillian's father had enrolled her in the YouthBuild program in September 2021. The program is for sixteen- to twenty-four-year-olds who have dropped out of high school. In the program, students obtain their GEDs and learn a skilled trade in industrial maintenance and welding. Daniels said Lillian performed well at first but that she became disrespectful and would not participate. Daniels interpreted this behavior to mean that Lillian wanted to "be grown," but Daniels added that she dealt with other similar-acting sixteen-year-olds in the program. Lillian would not wear the required uniform for welding, and she had a confrontation with another student who had dated Matthew in the past. Daniels spoke to Michael Houselog about concerns that Lillian was not participating. Eventually, due to her lack of participation, Lillian was released from the program. Before Lillian was released, she earned her GED and all but one of the certifications offered through the program. After her release, Lillian would continue to attend the YouthBuild program, where Matthew was also enrolled, but she chose to stay in the truck with her dog while the other students worked.

Chloe Simmons, Lillian's friend and the former girlfriend of Matthew's brother, testified about the events leading to the charge. Simmons lived with her boyfriend, Matthew, and Lillian for approximately five months. She had been living elsewhere for about a year when the incident occurred, but they had kept in touch. Lillian and Chloe exchanged text messages around October 27 and 30, 2022, about her Lillian's pregnancy. On November 7, 2022, Lillian texted Chloe that she had taken abortion pills and had felt so sick for two days she could not move. Lillian said that she delivered the baby and that it was "super traumatic." Lillian texted her, "He came out alive and way further along than I thought. It literally looked like a fully developed baby." She said that he stopped breathing about ten minutes later. Lillian tried to suction his nose and she clamped the cord, but the baby did not survive. At some point after the delivery, Matthew returned to their trailer. Lillian and Matthew were in shock and full of regret because the baby appeared to be nearly full term. Lillian wrapped the baby's corpse in a shirt, handed him to Matthew, and asked him to "do the rest." She told Chloe that she did not know and did not want to know what Matthew did with the baby. Before Matthew left with the corpse, Lillian advised him to put the baby in a place where dogs could not get to him, and she saw him take plastic bags with him. Lillian told Chloe she wished they could have given him a burial. At the end of the text conversation, Chloe reported the incident to the police.

Chet Stubbs, the deputy sheriff for the Sevier County Sheriff's Office, testified that around midnight on November 7, 2022, he responded to a video he had received from another deputy concerning a deceased baby. He went to Lillian and Matthew's residence where he saw that Lillian looked distressed and had blood on her gray sweatpants. Stubbs

and the other responding officers entered the residence because there appeared to be an ongoing medical emergency; however, he was uncertain whether an ambulance had been called.

Brian Hankins, an investigator for the Sevier County Sheriff's Office, testified that he also responded and went to Lillian's residence the night of November 7. They seized Lillian's phone and eventually obtained a search warrant for the phone. Hankins attempted to interview Lillian at the sheriff's office, but when Hankins informed her of her *Miranda* rights as a juvenile, she requested a lawyer, and the interview ended. Hankins said that Lillian had a poor attitude toward them and toward the whole situation. He said, "It was actually to a fact that, you know, she was bleeding everywhere. I mean, it was all over her sweatpants and she even made a note to tell us that she sat in all three chairs in the interview room to get blood all over them." Hankins said all three chairs had to be replaced. He described Lillian's attitude as hateful, disrespectful, uncooperative, and lacking remorse.

At the close of the hearing, the circuit court denied Lillian's juvenile-transfer motion and entered an order with written findings in support of its decision.

*This Court's Examination of Juvenile-Transfer Cases*

This court has developed a rubric across several cases to assess and determine whether a mistake has been made in juvenile-transfer decisions. In *Lopez v. State*, 2021 Ark. App. 467, at 16, 637 S.W.3d 318, 328, we looked at whether the written order provided enough detail and facts to support the court's conclusion that the juvenile's request to transfer his criminal case to juvenile court should be denied.

Also in *Lopez*, we distinguished *Spears v. State*, 2019 Ark. App. 576, 591 S.W.3d 803,[2] to determine whether there were "inconsistent" factual findings material enough to warrant a reversal of the transfer order. *Lopez*, 2021 Ark. App. 467, at 15, 637 S.W.3d at 328.

Finally, we have looked at whether the circuit court made specific findings on each statutory factor tailored to the juvenile and the evidence before the circuit court. *Randolph v. State*, 2017 Ark. App. 694, 537 S.W.3d 294.

In *Spears*, *Lopez*, and *Randolph*, this court has illuminated our basic task of reviewing the entire evidence—where we do not reweigh the evidence—while recognizing that there is no requirement that proof be introduced against the juvenile on each factor, and that the circuit court is not obligated to give equal weight to each of these factors in determining whether a case should be transferred. *K.O.P. v. State*, 2013 Ark. App. 667. These four tests together read as follows:

> (1) Are the circuit court's written findings accurate and consistent with the evidence; and
>
> (2) If any factual findings are *not* consistent with the evidence, are such inconsistencies material enough to warrant a reversal of the transfer order?
>
> (3) Does the written order provide enough detail and facts to support the court's conclusions; and
>
> (4) Are there specific findings on the statutory factors tailored to the juvenile and the evidence?

---

[2]In *Spears*, the denial of a juvenile-transfer motion was reversed and remanded by this court because we were unable to determine how much weight the circuit court had given to its accurate findings and how much it had given to its findings that were inconsistent with the proof at the hearing.

*See Spears*, 2019 Ark. App. 576, 591 S.W.3d 803; *Lopez*, 2021 Ark. App. 467, 637 S.W.3d 318; *Randolph*, 2017 Ark. App. 694, 537 S.W.3d 294.

Upon application of the principles set out in *Spears*, *Lopez*, and *Randolph*, and upon review of the entire evidence, while there may be some evidence to support the circuit court's decision not to transfer this case to juvenile court, we are left with a definite and firm conviction that a mistake has been committed.

Indeed, if we fail to reverse the circuit court on the basis of this record, we will have ceded meaningful judicial review of juvenile transfers to what would be, in effect, the absolute discretion of the prosecuting attorneys and the circuit courts.

*Legislative Intent and History of Ark. Code Ann. § 9-27-318*

The General Assembly enacted Ark. Code Ann. § 9-27-318 to ensure that all juveniles brought to the attention of the courts receive the guidance, care, and control—preferably in each juvenile's own home—that will best serve the emotional, mental, and physical welfare of the juvenile and the best interests of the State. Act 273 of 1989 § 2(1). The General Assembly also stated that its intent was to protect society more effectively by substituting for retributive punishment, whenever possible, methods of offender rehabilitation and rehabilitative restitution, recognizing that the application of sanctions that are consistent with the seriousness of the offense is appropriate in all cases. *Id.* § 2(3).

Act 1192 of 1999 codified significant and comprehensive changes in the Juvenile Code. This included the creation of extended juvenile jurisdiction, the clarification and expansion of a juvenile's right to an attorney during the entirety of the proceedings, housing of juveniles upon imprisonment and clarification of the role of the Division of Youth

Services (DYS). Act 1192 also added seven factors to the three existing factors used to determine whether a case involving a juvenile should be transferred from the adult circuit court. Before its 1999 revision, Ark. Code Ann. § 9-27-318(e) read as follows:

> (e) In making the decision to retain jurisdiction or to transfer the case, the court shall consider the following factors:
>
>> (1) The seriousness of the offense, and whether violence was employed by the juvenile in the commission of the offense;
>>
>> (2) Whether the offense is part of a repetitive pattern of adjudicated offenses which would lead to the determination that the juvenile is beyond rehabilitation under existing rehabilitation programs, as evidenced by past efforts to treat and rehabilitate the juvenile and the response to such efforts; and
>>
>> (3) The prior history, character traits, mental maturity, and any other factor which reflects upon the juvenile's prospects for rehabilitation.

Ark. Code Ann. § 9-27-318(e)(1)–(3) (Repl. 1998).

In *Blevins v. State*, 308 Ark. 613, 826 S.W.2d 265 (1992), our supreme court reversed the circuit court's denial of appellant's juvenile-transfer motion under the previous version of Ark. Code Ann. § 9-27-318, finding that the decision was clearly erroneous and against the preponderance of the evidence. Blevins, a sixteen-year-old, was charged with possession of a controlled substance with intent to deliver. After he was charged, Blevins moved to transfer his case to the juvenile court.

At the hearing on his motion, Blevins presented testimony that he was sixteen years old at the time of the incident, he had no prior record, he regularly attended high school, his grades were Cs and Ds, and he had previously participated in the high school athletic program. Blevins's mother also testified that her son lived at home and that she had had no disciplinary problems with him. However, the circuit court found that the seriousness of

the crime constituted clear and convincing evidence to deny the transfer. Our supreme court admonished the circuit court's failure to provide analysis or evidence to supports its findings when it stated:

> [I]t would have been most helpful to our analysis for the trial court to have enunciated its rationale; consequently, we can only deduce from the record that the trial court apparently found that the seriousness of the crime outweighed the other factors that were proven by Blevins at his hearing, such as the non-employment of violence in the commission of the alleged offense, the lack of a repetitive pattern of adjudicated offenses, and his positive character traits.

*Blevins*, 308 Ark. at 617, 826 S.W.2d at 267.

Our supreme court ultimately reversed the circuit court's order, and stated, "To hold otherwise would be to allow the trial court to simply categorize all felonies as serious, which they are, and utilize this reason alone to retain jurisdiction rather than transfer the case based on consideration of all of the statutory factors." *Id*., 826 S.W.2d at 267.

For similar reasons, our supreme court reversed the denial of a juvenile-transfer motion and remanded for an order consistent with its opinion under the previous version of Ark. Code Ann. § 9-27-318 in *Green v. State*, 323 Ark. 635, 916 S.W.2d 756 (1996). Green, a fourteen-year-old, was charged with manslaughter after inadvertently, but fatally, shooting his thirteen-year-old friend in the chest. The testimony at Green's hearing was that the shooting was accidental, but Green had a fascination with guns and would often take his father's pistol out when he was home alone or with friends. He had no prior criminal history; he maintained a 3.4 grade point average in school; and he had been inducted into the Beta Club; but after the shooting, his grade point average dropped to a 2.4. He had been suspended from school due to the felony charge and was experiencing nightmares that

14

required prescription medicine and psychological counseling. At the conclusion of the hearing on the motion to transfer, the circuit court denied the juvenile-transfer motion, stating:

> I have listened to the testimony and among other things, as it was pointed out, that Justin is a violent person and there's two major factors I have given substantial consideration to. One is the seriousness of the offense and the other is a death caused by a firearm. These are the two primary factors that I've considered in deciding that this matter should be heard by the Circuit Court as opposed to juvenile court, although that does not mitigate the evidence of the type of person that Justin Green is. But under these circumstances the Court finds the Motion to Transfer should be denied.

*Id.* at 639, 916 S.W.2d at 758.

Our supreme court reprimanded the circuit court for failing to evaluate factors two and three and reversed and remanded for transfer to the juvenile court:

> Seriousness alone is not a sufficient basis to refuse the transfer. *See Holmes v. State*, 322 Ark. 574, 911 S.W.2d 256 (1995). Thus, evidence in support of applying factor (1) to justify refusal to transfer is incomplete, and factors (2) and (3) weigh in favor of transfer. True, as mentioned above, the Trial Court need not have given equal weight to each of the statutory factors for deciding whether to transfer, but in this instance application of them, no matter how they are weighed, points decidedly toward juvenile court.

*Id.* at 641, 916 S.W.2d at 759.

Following the 1999 amendments to section 9-27-318, neither this court nor our supreme court has reversed in full a juvenile-transfer motion. The 1999 amendments were intended to expand and clarify the rights of juveniles. Its original purposes rooted in the efforts "to best serve the emotional, mental, and physical welfare of the juvenile and the best interests of the state," were not changed with the passage of Act 1192.

Section 9-27-318(h)(1) now requires the circuit court to make written findings on ten factors relating not only to the seriousness of the crime but also to other considerations,

including whether the alleged offense was committed in an aggressive, violent, premeditated, or willful manner and the maturity, knowledge, and history of the juvenile to determine whether rehabilitative services would be effective at the given stage of the juvenile's life.

*The Circuit Court's Findings and the Evidence Presented*

We discuss below (1) the ten factors required pursuant to Ark. Code Ann. § 9-27-318(g); (2) the circuit court's findings in its May 4, 2023 order denying Lillian's motion; (3) an evaluation of the evidence presented as compared to the order's findings; and (4) an analysis of how this evidence functions under the tests set forth in *Spears*, *Lopez*, and *Randolph*, *supra*.

> *(1) The seriousness of the alleged offense and whether the protection of society requires prosecution in the criminal division of circuit court.*

> **This offense is very serious and requires the protection of society through the prosecution in the criminal division of circuit court.**

The circuit court has merely rewritten the first factor as a conclusion. There are no "specific findings tailored to . . . the evidence." *See Randolph*, 2017 Ark. App. 697, at 8, 537 S.W.3d at 299. There was no evidence presented at the hearing as to the potential threat to society if the case were transferred to juvenile court. Lillian's attempt to self-induce an abortion resulted in a premature birth.[3] After trying, and failing, to save her premature baby's life, Lillian, who had just delivered a baby and was still bleeding, asked Matthew to take

---

[3]There was no evidence in the record regarding any autopsy or toxicology reports describing what medication Lillian ingested, whether and in what quantities it was found in either Lillian or the deceased premature baby, or the expected effects of the medication on one who has ingested it or on the premature baby.

care of "the rest." What, exactly, is the danger that Lillian poses to society and how does trying her as an adult further the goal of "the protection of society" any more effectively than seeking her rehabilitation in the juvenile division?

Here, the written order fails to include details and facts to support the circuit court's conclusions. There are no specific findings on the statutory factors tailored either to Lillian or to the evidence.

*(2) Whether the alleged offense was committed in an aggressive, violent, premeditated, or willful manner.*

**This offense was committed in a violent, premeditated and willful manner.**

Again, the circuit court simply restates the factor to be considered in conclusory fashion yet offers no evidence to support its finding. Further, the circuit court found that three elements of this factor were present but made no specific findings with *any* detail or facts to support its conclusions. Thus, it wholly fails to chin the bar required by our precedent as synthesized in the tests set forth in *Spears*, *Lopez*, and *Randolph* discussed above.

Important to examine here is the criminal charge itself. Pursuant to Ark. Code Ann. § 5-60-101 (Repl. 2016), a person commits abuse of a corpse if, except as authorized by law, he or she knowingly:

(1) Disinters, removes, dissects, or mutilates a corpse; or

(2)(A) Physically mistreats or conceals a corpse in a manner offensive to a person of reasonable sensibilities.

(B) A person who conceals a corpse in a manner offensive to a person of reasonable sensibilities that results in the corpse remaining concealed is continuing in a course of conduct under § 5-1-109(e)(1)(B).

17

(C)(i) As used in this section, "in a manner offensive to a person of reasonable sensibilities" means in a manner that is outside the normal practices of handling or disposing of a corpse.

(ii) "In a manner offensive to a person of reasonable sensibilities" includes without limitation the dismembering, submerging, or burning of a corpse.

Lillian argues that there was no evidence showing that she knew where the corpse would be placed and that the crime was therefore not willful. The only evidence was that Lillian (1) handed the body to Matthew; (2) did not want to know what he did with it; and (3) requested that whatever he did, to place it somewhere the dogs could not get it. The only "willful" action was handing the body to Matthew.

Lillian adds that there was no evidence presented that the alleged crime was premeditated or violent. The State argues that "the evidence that she took the abortion pills to terminate her pregnancy was relevant to the court's findings that she and Matthew planned, participated, and committed the offense in a premeditated, willful, and violent manner."

Evidence of planning to terminate a pregnancy is not evidence of planning to abuse a corpse. Whether a person medically induces an abortion is irrelevant to charges outside of that action. We held in *Bynum v. State*, 2018 Ark. App. 201, 546 S.W.3d 533, that neither evidence that Bynum had taken pharmaceutical drugs prior to delivery nor evidence of abortions (or the number of them) she had previously undergone was relevant to the charge that she had committed the offense of concealing birth. Such evidence did not tend to make it more or less probable that Bynum had hidden her newborn's corpse with the purpose to conceal the birth.

Further, Ark. Code Ann. § 5-61-404 states:

(a) A person shall not purposely perform or attempt to perform an abortion except to save the life of a pregnant woman in a medical emergency.

(b) Performing or attempting to perform an abortion is an unclassified felony with a fine not to exceed one hundred thousand dollars ($100,000) or imprisonment not to exceed ten (10) years, or both.

(c) This section does not:

> (1) Authorize the charging or conviction of a woman with any criminal offense in the death of her own unborn child; or
>
> (2) Prohibit the sale, use, prescription, or administration of a contraceptive measure, drug, or chemical if the contraceptive measure, drug, or chemical is administered before the time when a pregnancy could be determined through conventional medical testing and if the contraceptive measure, drug, or chemical is sold, used, prescribed, or administered in accordance with manufacturer instructions.

(d) It is an affirmative defense to prosecution under this section if a licensed physician provides medical treatment to a pregnant woman which results in the accidental or unintentional physical injury or death to the unborn child.

The State argues that Lillian's ingestion of abortion-inducing chemicals is evidence of violence and premeditation with respect to the alleged abuse-of-a-corpse crime. However, the legislature has specifically forbidden that a mother be criminally charged for the death of her unborn child as a result of her ingestion of the abortion pills. Ark. Code Ann. § 5-61-404(c)(1) (Supp. 2023). Lillian cannot be charged for that conduct, but the State has attempted to attach her conduct to the abuse-of-a-corpse charge to demonstrate premeditation and violence. As with the reasoning in *Bynum*, the State's argument goes far afield of the factors to consider in whether to transfer to the juvenile division.

The evidence presented shows that Lillian did not know what Matthew planned to do with the deceased baby's body because no consideration was given to the disposal of the

body until the moment Lillian handed the baby to Matthew after he had passed. There was no evidence at the hearing to support the circuit court's finding that the offense was committed in a violent, premeditated, or willful manner. This finding is not merely inconsistent with, but is wholly unsupported by, the evidence. As part of a review of the entire evidence, it is certainly material.

*(3) Whether the offense was against a person or property, with greater weight being given to offenses against persons, especially if personal injury resulted.*

**This offense was committed to a recently deceased person, the Defendant's baby.**

Both parties delve deep into an analysis of what the abuse-of-corpse charge is meant to protect: a person or a corpse? Lillian argues that abuse of a corpse does not involve a "person" but rather a "corpse" and that this factor in the juvenile-transfer statute gives the circuit court discretion for defendants presenting a threat to others to be prosecuted as an adult. The State argues that the corpse, "first and foremost was a person."

Lillian relies on *Dougan v. State*, 322 Ark. 384, 912 S.W.2d 400 (1995). In *Dougan*, our supreme court examined several different authorities' definitions and interpretations of "abuse of a corpse," including the drafters' intent behind the abuse–of–a–corpse statute. In ascertaining the common law, we look not only to our own cases but also to early English cases, early writers on the common law, and cases from other states. *Dougan*, 322 Ark. at 389, 912 S.W.2d at 403. "Wharton's Criminal Law, 12th Ed., Vol. II, § 1704, says: '*Indecency in treatment of a dead human body is an offense at common law, as an insult to public decency*.'" *Id.* at 390, 912 S.W.2d at 403 (citing *Baker v. State*, 215 Ark. 851, 223 S.W.2d 809 (1949)).

Lillian argues that this shows that abuse of a corpse is not committed against a person, but against "public decency."

The State argues that in *Dougan*, our supreme court quotes language in the Model Penal Code treating the felony offense as a crime against persons: "The overreaching purpose is to protect against outrage to the feelings of friends and family of the deceased." *Id*. at 390 (quoting Modal Penal Code § 251.10). The State also argued that in *Hammonds v. State*, 2010 Ark. App. 465, 375 S.W.3d 713, this court held that the offense was intended to prohibit neglect as well as the affirmative act of physical mistreatment of the deceased person. In fact, this court did not state that the offense was intended to protect a deceased person. Rather, we stated:

> The abuse-of-a-corpse statute was formerly designated as Ark. Stat. Ann. § 41-2920 (Repl. 1977), and the commentary provided:
>
>> The primary purpose of the section is to protect the feelings of the family of the deceased person.
>
> The above commentary leaves open the possibility that neglect, as opposed to some affirmative act of physical mistreatment, may under the right circumstances satisfy the elements of the statute.

*Id*. at 4, 375 S.W.3d. at 715.

Consistent with the authorities cited in *Dougan*, this court cited language in *Hammonds* showing that the primary purpose of the statute is to protect the *feelings of the family* of deceased persons, not the deceased person himself. The statute was designed to protect public decency by protecting the feelings of the family of a deceased person.

Again, there was no evidence presented at the hearing that the crime was committed against a person, and our case law supports the conclusion that the abuse-of-a-corpse statute

protects public decency and feelings rather than a person. The circuit court simply applied the wrong analysis.

> *(4) The culpability of the juvenile, including the level of planning and participation in the alleged offense.*

> **The culpability of the Defendant was a major factor in this crime mainly due to her planning and participation. The culpability of the Defendant was knowingly, if not purposely.**

As with second factor, the lack of evidence introduced regarding Lillian's violence, premeditation, and willfulness in the crime is applicable to this factor as well. Because there was no evidence presented that the events that took place after the baby had passed away were premeditated or willful, there is also no evidence that the events were planned. Far from planning the disposal of a corpse, Lillian was trying to save her baby's life.

There is no evidence in the record from which a fact-finder could conclude that Matthew and Lillian planned what to do with the corpse. The only evidence available was that she had ceded subsequent actions to Matthew. The record reveals that Lillian undisputedly did not accompany him afterward; therefore, there was no way she could know what Matthew would do next. The findings contain a conclusory statement that Lillian's culpability was "knowingly, if not purposely," yet the written order provides no details or facts to support the court's conclusions. Once again, the order fails the tests set forth in *Spears*, *Lopez*, and *Randolph*.

> *(5) The previous history of the juvenile, including whether the juvenile had been adjudicated a juvenile offender and, if so, whether the offenses were against persons or property, and any other previous history of antisocial behavior or patterns of physical violence.*

> **The juvenile has not been adjudicated a juvenile offender.**

22

Neither Lillian nor the State takes issue with the circuit court's findings here. We agree that the circuit court did not err in making this finding.

*(6) The sophistication or maturity of the juvenile as determined by consideration of the juvenile's home, environment, emotional attitude, pattern of living, or desire to be treated as an adult.*

**The juvenile made mature decisions since she was approximately fifteen (15) years of age, and operated and lived as an adult for two (2) or more years prior to the crime being committed. She appeared, by her choices and pattern of living, to be living as an adult with her boyfriend for at least two (2) years without adult supervision, control or oversight. The Defendant's desire to be treated as an adult was not only apparent by her lifestyle, but how she treated others in the community and how adults treated her. While living as an adult with her boyfriend, she obtained her GED and attended college courses, obtaining her ACT Workkeys National Career Readiness Certificate, Certificate of Mental Toughness, Workforce Preparation Certificate, a Core Leadership Skills certificate, all from the Cossatot Community College of the University of Arkansas in addition to completing the YouthBuild Program. The Defendant made her own decisions as to what, where, when and how she would live her life, as an adult would make said decisions, for at least two (2) years prior to the crime and willingly partook in consuming alcohol, illegal substances and tobacco as adults.**

These findings do not accurately reflect the entire evidence presented on Lillian's maturity. Some of the circuit court's specific findings are not only inconsistent with the evidence but also contradictory.

For example, the circuit court states, "*She appeared, by her choices and pattern of living, to be living as an adult with her boyfriend for at least two (2) years without adult supervision, control or oversight.*" This statement is simply not supported by the evidence.

Lillian lived in the home of Rhonda Martz, Matthew's mother, and Rhonda's adult boyfriend, Pedro. After Rhonda and Pedro were evicted, Lillian and Matthew did not find

23

a place to live on their own; instead, they moved into a trailer with Matthew's older adult brother. At *no* time was Lillian living "without adult supervision, control or oversight."

Rhonda testified that Lillian kept to herself and played on her phone. Lillian didn't cook for herself and Matthew. Rhonda would cook and tell Lillian that supper was ready. Further, Rhonda described how she and her family were struggling financially and that it put a strain on them to have another mouth to feed. Certainly, Lillian was not contributing to the household as an "adult." Lillian accused Rhonda of wearing Lillian's clothes. Rhonda testified that, rather than resolve the issue with Lillian, she reached out to Michael Houselog for help with her behavior. Regarding Lillian and Matthew's relationship, Rhonda said they would argue and break up but would eventually work it out. She said most of the fights stemmed from "drama" on social media but that overall, they were in "young love" and enjoyed their time together.

No doubt, adults can engage in petty behavior, engage in social media "drama," and act out in fits of jealousy. But under the statute, the question is not whether adults sometimes engage in childish or adolescent behavior; rather, the question is whether, on the basis of a review of the entire evidence, Lillian's pattern of conduct, level of sophistication, and maturity were more like that of an adult or that of an immature child.

Next, the circuit court found that "*[t]he Defendant's desire to be treated as an adult was not only apparent by her lifestyle, but how she treated others in the community and how adults treated her.*"

Her "lifestyle" included not having a driver's license—much less her own vehicle— with which she could independently transport herself to and from a job. She had no

employment other than occasional babysitting jobs. She did not contribute financially to the rent, utilities, or other household responsibilities. Rhonda was responsible for Lillian's transportation. Lillian never sought regular employment. There are two rites of passage that have long signified the transition from adolescence to adulthood: getting a car and a job. In *Flowers v. State*, 2017 Ark. App. 468, 528 S.W.3d 851, this court found that the circuit court's findings supported the juvenile's transfer to adult court; specifically, regarding the sophistication or maturity of the juvenile, Flowers had graduated high school, had worked full time since the age of fifteen, and had purchased his own vehicle.

Lillian never sought emancipation from her minor disabilities and thus could not enter into contracts from which to facilitate an adult "lifestyle." She was never self-sufficient. Michael Houselog testified about talking to his daughter frequently, texting frequently, tracking her with her phone's GPS, sending her money, and providing her with clothing from his ex-wife—all while Lillian lived in Arkansas.

With respect to how Lillian treated others in the community and how adults treated her, it is difficult, if not impossible, to square the entirety of the evidence with the circuit court's conclusions regarding sophistication, maturity, and emotional attitude. The record contains an abundance of examples of immature adolescent behavior. In addition to the petty rift arising from the accusation that Rhonda was wearing her clothes, Lillian instigated an altercation with another girl who sat too close to Matthew at a campfire. They had to be physically separated. In the YouthBuild program, Lillian and a girl who had dated Matthew had to be kept apart. Deputy Hankins testified that Lillian told him she had intentionally sat in and soiled three different chairs in an interview room from her postdelivery bleeding. If

an adult were to engage in this type of behavior, that person would be called petty, childish, and immature.

Further, the circuit court found: "*The Defendant made her own decisions as to what, where, when and how she would live her life, as an adult would make said decisions, for at least two (2) years prior to the crime.*"

Michael Houselog traveled to Arkansas to investigate the YouthBuild program and to register Lillian. After dropping out of high school, Lillian did not seek out, or register for, the program. She completed her GED in 2022 but ultimately was asked to leave the program due to lack of participation. When Lillian began to flounder in the program, Leslie Daniels did not sit down with Lillian and hash out a plan for success in an adult manner; rather, Ms. Daniels reached out to Michael as the responsible party.

When asked, "Mr. Houselog, does that not sound more like an adult child that a grown parent is going to visit sporadically in a state nine hours away? Than a 15-year-old child?" Michael responded, "I felt like I was parenting, and I felt like her mother was parenting." When asked again about Lillian's independence, Michael stated, "I have adult – other adult children and they don't live a similar life that she lives. So I would say the answer to that is no. It's not the same as my older children live." He continued, "There was dependency on her mother and father for support, which is much more of an adolescent action than I would feel portrayed by your question." Between the evidence presented by Rhonda and Michael, the circuit court's finding that Lillian had *no* adult supervision, control or oversight when she went to Arkansas is simply not consistent with the entire evidence presented at the hearing.

26

Citing Lillian's achievements in the YouthBuild program as evidence of her adult decision-making is also inconsistent with the evidence presented. As previously stated, Lillian did not enroll herself in the program, her father did. While Daniels explained that Lillian was a good student while in the program, she stopped participating in the program, she refused to wear the required uniform, and she was disrespectful. Although Ms. Daniels said that Lillian's disrespectful attitude was indicative of her "acting grown," Ms. Daniels admitted that other sixteen-year-olds in the program had acted similarly. This is objectively not mature, adult behavior. It is more the behavior of an adolescent.

Again, Lillian did not have a driver's license during this time. She relied on Rhonda for transportation while in Arkansas, and her father drove her to and from Illinois several times while she was living with Matthew. By any stretch, this would severely restrict the "what, where, when, and how" of her lifestyle. She was not financially independent. The circuit court's finding that Lillian made "her own decisions as to what, where, when and how she would live her life" is neither an accurate nor a complete representation of Lillian's life during this time. Other than choosing where to live, which was with Matthew, she was directed by her father to attend the YouthBuild program, she had to ask Rhonda to be driven anywhere she was going, and she did not have money to support herself.

The evidence does not support the circuit court's finding that Lillian acted as an autonomous, independent adult.

> *(7) Whether there are facilities or programs available to the judge of the juvenile division of circuit court that are likely to rehabilitate the juvenile before the expiration of the juvenile's twenty-first birthday.*

**This Court finds that there are few, if any, viable options remaining in the juvenile division of circuit court that are likely to rehabilitate**

27

**the Defendant before the expiration of her twenty-first (21st) birthday.**

There was no evidence presented to support this finding. No evidence was introduced as to what services might be available to Lillian because the State objected to the introduction of affidavits from the coordinator of the Juvenile Ombudsman Division of the Arkansas Public Defender Commission, the DHS coordinator of the Interstate Compact for Juveniles ("ICJ"), and an ICJ publication to explain to the court the juvenile services available to Lillian and how she would be supervised if she returned to Illinois to live with her parents. The State objected on the grounds that the affiants would not be available for cross-examination, and the circuit court sustained the objection. Despite the lack of evidence that there are services available, the circuit court found that "few" services are available. The circuit court's finding on this factor is another example of the circuit court making a finding with no supporting evidence.

*(8) Whether the juvenile acted alone or was part of a group in the commission of the alleged offense.*

**From the testimony and evidence submitted during this hearing, the Defendant appeared to have planned and acted with her boyfriend, who is the Co-Defendant in this matter.**

Again, there was no evidence presented that Lillian planned, premeditated, or acted willfully to abuse a corpse. The State's argument is not convincing that this offense was planned by Lillian because she planned to have an abortion. The act of having an abortion is separate from the abuse-of-a-corpse offense with which she was charged, and it should be treated as such. *See Bynum*, 2018 Ark. App. 201, 546 S.W.3d 533 (holding that whether Bynum had taken pharmaceutical drugs prior to delivery or whether there was any evidence

28

of abortions she had previously undergone was irrelevant to the charge that she had committed the offense of concealing birth; they did not tend to make it more or less probable that Bynum had hidden her newborn's corpse with purpose to conceal the birth).

*(9) Written reports and other materials relating to the juvenile's mental, physical, educational, and social history; and*

**There were not any written reports submitted dealing with the Defendant's mental, physical, educational and social history, except for the report from the Defendant's expert. The court did not allow the introduction of such report into evidence in that it contained "testimony" that was contrary to the expert's actual testimony, and it contained "opinions" that the expert was not qualified to give based upon her experience. Furthermore, said expert testified in person as to all the "history" of the Defendant.**

Lillian argues that the circuit court clearly erred by not admitting Dr. Karla Fischer's report for consideration and by not considering Dr. Fischer's testimony. Arkansas Code Annotated § 9-27-318(g)(9) states that "in the transfer hearing, the court *shall* consider *all* of the following factors including written reports and other materials relating to the juvenile's mental, physical, educational, and social history." (Emphasis added.) Lillian argues that the circuit court was statutorily required to consider Dr. Fischer's report, and its failure to do so was erroneous.

Although the circuit court did not allow Dr. Fischer's report to be admitted into evidence, the circuit court was correct that Dr. Fischer testified as to Lillian's history. Specifically, Dr. Fischer testified that Matthew had subjected Lillian to domestic abuse and that this abuse made her less capable than a normal person of making decisions independently. The circuit court's characterization of Dr. Fischer's opinions appears to be inconsistent with the evidence presented. On this issue, Dr. Fischer presented ample

evidence of the effects of domestic abuse on the psychological welfare and development of adolescents, and in particular the effects it had on Lillian, but the circuit court found that Dr. Fischer expressed opinions in her report that she was not qualified to make.

*(10) Any other factors deemed relevant by the judge.*

> **This Court also finds as a major factor the Defendant's father's opinion as to the mental maturity and decision making ability very relevant in this decision. The Defendant's father is an educated, retired school teacher, special education teacher, principal and superintendent of schools. His experience appears to be great in dealing with juveniles. He described the Defendant as a student who did not struggle with schoolwork. When the Defendant decided at the age of sixteen (16) years of age to move to Arkansas with her boyfriend, he and the Defendant's mother allowed the move and adhered to the Defendant's decision. After a few months, the Defendant and her boyfriend moved back to Illinois and stayed with them for three (3) months. When the Defendant decided to move back to Arkansas with her boyfriend, the father drove both the Defendant and her boyfriend back to Lockesburg, Arkansas, "to their house . . . and left them there." Later, when Arkansas DHS took custody of the Defendant, the father met DHS in West Memphis, Arkansas, taking possession back of the Defendant. However, the father drove the Defendant straight back to Lockesburg at the Defendant's request and left her there with her boyfriend. Father admitted that all of this was an adult decision on the part of the Defendant that he and the mother allowed. It was apparent from the testimony that the father believed that the Defendant was mature enough mentally and physically to make said decisions and live as an adult in another state. Except for the Defendant's expert, which this Court did not find credible, there was not any significant testimony that the Defendant was not mature and capable of making adult decisions. Actually, all the remaining testimony of anyone who spent significant time with the Defendant was that the Defendant lived like an adult and made decisions like an adult with other adults believing she was capable of making said decisions as an adult.**

Here, the circuit court relied heavily on Michael Houselog's testimony as a "major factor" as to Lillian's mental maturity and decision-making abilities. Again, this appears to

be inconsistent with Michael's testimony as a whole. Michael was asked several times whether he believed Lillian was operating as an adult. Each time, he denied that she was behaving as an adult behaves. This aspect of Michael's testimony is not included in the circuit court's findings.

In its findings, the circuit court stated, "*It was apparent from the testimony that the father believed that the Defendant was mature enough mentally and physically to make said decisions and live as an adult in another state.*" This is not what he said. In addition to his testimony that both he and his wife asked Lillian not to go to Arkansas, Michael repeatedly said that he provided Lillian financial support, he talked to her frequently both on the phone and via text message, he paid her cell phone bill, he enrolled her in school when she elected to drop out of high school, and he believed both he and his ex-wife were parenting her. He characterized her behavior as adolescent. Lillian's journey to Arkansas, which ended in this tragedy, began as a consequence of Michael and his ex-wife enabling their fifteen-year-old daughter's immature impulse to leave Illinois with an adult she had met on the internet. It was not the reasoned decision of a minor making adult decisions that caused Lillian's interstate move.

The circuit court went on to state in its findings, "*Except for the Defendant's expert, which this Court did not find credible, there was not any significant testimony that the Defendant was not mature and capable of making adult decisions. Actually, all the remaining testimony of anyone who spent significant time with the Defendant was that the Defendant lived like an adult and made decisions like an adult with other adults believing she was capable of making said decisions as an adult.*"

Testimony from Rhonda Martz showed that Lillian was responsible and quiet but still someone she considered a dependent living in her home. Even when they were forced to move out of their home, Rhonda lived in an RV next to the trailer where Lillian, Matthew, and Matthew's older brother lived. Lillian's father enrolled her in the YouthBuild program, and when she began showing disinterest in the program, it was Michael whom the program director, Leslie Daniels, called. Ms. Daniels did not treat Lillian as the responsible party in that situation, and despite saying that Lillian's disrespectful behavior was an attempt to "act grown," Daniels acknowledged that many other sixteen-year-olds in the program behaved the same way.

The evidence showed that Lillian decided to move to Arkansas to live with her boyfriend in the throes of emotional turmoil caused jointly by the COVID pandemic and her parents' divorce. However, Michael Houselog did not ever say that this behavior was mature, adult, or independent of his or his ex-wife's supervision. Giving equal weight to Michael Houselog's testimony as the circuit court did, Michael's entire testimony suggests that he did not believe his daughter to be a mature, independent adult. Again, this finding by the court is inconsistent with the proof and material to a determination of whether to reverse the circuit court's decision.

*The Entire Evidence Does Not Support the Circuit Court's Decision*

Simply put, the entire evidence reveals that during her time in Arkansas, Lillian was an immature, isolated, dependent, abused teenager prone to fits of jealousy, anger, and petty disputes. At the same time, following a painful birth without labor and delivery medications and suffering postpartum bleeding, she tried to resuscitate her baby and managed to clamp

the umbilical cord as she suctioned fluid to help the baby breathe. She expressed great anguish, regret, and pain in her texts to Chloe. Lillian was a young, unsophisticated, scared child caught in a situation that her maturity level was ill-equipped to handle.

As to the crime she was charged with, there was no evidence introduced that the crime was violent or that granting her transfer would pose a threat to society. Lillian did not believe she was delivering a fully formed baby, and when she did, she attempted to keep him alive. There was no evidence presented that she planned, premeditated, or willfully committed the alleged crime. There was no evidence that she is a violent person. She is merely a young girl who, without any support, had just given birth in a trailer. It is hard to imagine that anyone who goes through that would instantly revert to a violent person who would commit a premeditated and willful crime.

We recognize that the circuit court is not required to give equal weight to each of the juvenile-transfer factors. *Shaw*, 2023 Ark. App. 55, 660 S.W.3d 591. However, as stated earlier, this court has reversed and remanded juvenile-transfer cases when we are unable to tell how much weight the circuit court gave to its accurate findings and how much it gave to its findings that were inconsistent with the proof at the hearing. *Spears v. State*, 2019 Ark. App. 576, 591 S.W.3d 803.

Here, as in *Spears*, it is unclear how much weight the circuit court gave to findings inconsistent with the evidence presented at the hearing, but it appears to be significant. The circuit court's inconsistent findings, specifically as to Lillian's adult, independent, mature lifestyle, the nature of the crime, and Lillian's involvement prior to and during the

33

commission of the alleged crime, were material to the circuit court's decision to deny the transfer.

The present case goes a significant step beyond *Spears* because the evidence as a whole, not just certain factors, leaves this court with a definite and firm conviction that the circuit court clearly erred in denying Lillian's juvenile-transfer motion.

Despite its revision in 1999, the juvenile-transfer statute's intent remains the same as when it was initially enacted: to evaluate and serve the emotional, mental and physical welfare of the juvenile and to substitute for retributive punishment, whenever possible, methods of rehabilitation while also imposing sanctions consistent with the seriousness of the crime.

Examining the evidence against the tests set forth in *Spears*, *Lopez*, and *Randolph* enumerated above, it does not appear that the circuit court's written findings are accurate and consistent with the evidence, and these inconsistencies are certainly material to the reversal of the transfer order. On several occasions, the circuit court did not provide any detail or facts to support its conclusions. Finally, there are specific findings on the statutory factors, however, they are not tailored to the juvenile or to the evidence. On all four tests gathered from various case law, this circuit court's order fails when applied against the entire evidence.

We acknowledge that circuit courts have great discretion to weigh the statutory factors as they wish when making a juvenile-transfer decision. However, according to our standard of review, this court has the appellate authority to review the circuit courts' decisions, considering the entire evidence—not just the weight afforded to individual

factors. Here, our review of this order entered by the circuit court reveals that it is inconsistent with the entire evidence presented. If we do not reverse this order on the entire evidence, we disregard our standard of review and give circuit courts unfettered discretion despite the evidence presented at a juvenile-transfer hearing.

Reversed.

VIRDEN, GLADWIN, and HIXSON, JJ., agree.

HARRISON, C.J., and KLAPPENBACH, J., dissent.

**BRANDON J. HARRISON, Chief Judge, dissenting**. I respectfully dissent from the majority's decision to supplant its judgment for the circuit court's. Because I am not left with a firm and definite conviction that a mistake was made, I would affirm the denial of the motion to transfer.

KLAPPENBACH, J., joins.

*If/When/How*, by: *Sara Ainsworth*, *Farah Diaz-Tello*, and *Yveka Pierre*, pro hac vice; and *University of Arkansas School of Law Legal Clinic*, by: *Matthew Bender* and *Jacob Worlow*, for appellant.

*Donn H. Mixon*; and *Juvenile Law Center*, by: *Marsha L. Levick*, pro hac vice, for amici curiae, Juvenile Law Center, Human Rights Watch, and National Center for Youth Law.

*Tim Griffin*, Att'y Gen., by: *Rebecca Kane*, Ass't Att'y Gen., for appellee.