Cite as 2025 Ark. App. 300

# ARKANSAS COURT OF APPEALS
## DIVISION IV
### No. CR-24-552

| | | |
|---|---|---|
| MINOR CHILD | | Opinion Delivered May 14, 2025 |
| | APPELLANT | |
| | | APPEAL FROM THE ARKANSAS COUNTY CIRCUIT COURT, NORTHERN DISTRICT [NO. 01SCR-24-37] |
| V. | | |
| STATE OF ARKANSAS | | |
| | APPELLEE | HONORABLE DONNA GALLOWAY, JUDGE |
| | | AFFIRMED IN PART; DISMISSED IN PART |

**BART F. VIRDEN, Judge**

The State charged fourteen-year-old Minor Child (MC) as an adult with four counts of first-degree battery and one count of attempted first-degree murder after he allegedly shot an individual four times. MC moved to transfer his case from the criminal division of circuit court to the juvenile division. Following a hearing, the Arkansas County Circuit Court denied the motion. MC appeals from that decision, arguing that the trial court clearly erred in refusing to transfer the case because the relevant factors weighed in favor of a transfer. We affirm in part and dismiss in part.

I. *Jurisdiction and Standard of Review*

The State may file a motion in the juvenile division of circuit court to transfer a case to the criminal division of circuit court or to designate a juvenile as an extended juvenile

jurisdiction offender when the case involves a fourteen- or fifteen-year-old juvenile who engages in conduct that if committed by an adult would be a felony attempt to commit first-degree murder. Ark. Code Ann. § 9-27-318(b)(1)(K)(ii) (Repl. 2020). Here, the State brought the attempted-murder charge in the criminal division—rather than the juvenile division—of circuit court and did not transfer the case to the criminal division from the juvenile division. Although the State declined to address this issue on appeal because it was not raised by MC, the criminal division of circuit court did not have jurisdiction over the attempted-murder charge under these circumstances. *See, e.g., Lopez v. State*, 2021 Ark. App. 467, 637 S.W.3d 318. We therefore dismiss, in part, the trial court's order as it pertains to attempted first-degree murder.

Regarding the four counts of first-degree battery, a prosecuting attorney may charge a juvenile in either the juvenile or criminal division of circuit court when a case involves a juvenile who is fourteen or fifteen years old when he engages in conduct that, if committed by an adult, would be first-degree battery. Ark. Code Ann. § 9-27-318(c)(2)(F). On the motion of the court or any party, the court in which the criminal charges have been filed shall conduct a hearing to determine whether to transfer the case to another division of circuit court having jurisdiction. Ark. Code Ann. § 9-27-318(e). The moving party bears the burden of proving that the case should be transferred to the juvenile division of circuit court. *Stowers v. State*, 2024 Ark. App. 216, 687 S.W.3d 359. The trial court shall order the case transferred to another division of circuit court only upon a finding by clear and convincing evidence that the case should be transferred. Ark. Code Ann. § 9-27-318(h)(2). Clear and convincing

evidence is that degree of proof that will produce in the trier of fact a firm conviction as to the allegation sought to be established. *Stowers*, *supra*. We will not reverse a trial court's determination whether to transfer a case unless the decision is clearly erroneous. *Id.* A finding is clearly erroneous when, after reviewing the evidence, the appellate court is left with a firm and definite conviction that a mistake was made. *Id.*

In the transfer hearing, the court shall consider all of the following factors:

(1) The seriousness of the alleged offense and whether the protection of society requires prosecution in the criminal division of circuit court;

(2) Whether the alleged offense was committed in an aggressive, violent, premeditated, or willful manner;

(3) Whether the offense was against a person or property, with greater weight being given to offenses against persons, especially if personal injury resulted;

(4) The culpability of the juvenile, including the level of planning and participation in the alleged offense;

(5) The previous history of the juvenile, including whether the juvenile had been adjudicated a juvenile offender and, if so, whether the offenses were against persons or property, and any other previous history of antisocial behavior or patterns of physical violence;

(6) The sophistication or maturity of the juvenile as determined by consideration of the juvenile's home, environment, emotional attitude, pattern of living, or desire to be treated as an adult;

(7) Whether there are facilities or programs available to the judge of the juvenile division of circuit court that are likely to rehabilitate the juvenile before the expiration of the juvenile's twenty-first birthday;

(8) Whether the juvenile acted alone or was part of a group in the commission of the alleged offense;

(9) Written reports and other materials relating to the juvenile's mental, physical, educational, and social history; and

(10) Any other factors deemed relevant by the judge.

Ark. Code Ann. § 9-27-318(g).

## II. *Transfer Hearing*

MC presented testimony by Brooke Digby, juvenile ombudsmen with the Arkansas Public Defender Commission; and his mother, Angela Taylor. Digby testified that she monitors all of the Division of Youth Services (DYS) facilities and advocates for children in the juvenile prison system. She said that services for MC would definitely be helpful and that it did not appear as though MC had had any true rehabilitative services in juvenile court. She acknowledged that MC had completed the civilian student training program (CSTP), yet he still shot someone. She said, however, that her concern was MC's home environment. Digby testified that she had met with MC at the jail a couple of weeks before the hearing for "probably over an hour" and had spoken with the director at the jail about MC's behavior. Digby testified that MC is a "young kid" and that there is "still plenty of time to work with him."

Taylor testified that MC is "not a troubled kid at all" and that the only problem is MC's friends. She said that she, MC, and her sixteen-year-old daughter live with her (Taylor's) father and that she has a job working the "graveyard shift." Taylor testified that

4

MC was diagnosed as aggressive when he was three years old after he threatened his Head Start school. She took him to Pinnacle Point where he was prescribed trazodone and received therapy. Taylor said that MC stopped taking the medication when he was approximately eight years old because it had stopped helping him and that he did not receive therapy after sixth grade because Pinnacle Point had moved out of Arkansas County. Taylor further testified that MC witnessed domestic violence when he was five years old after his own father held a gun on her, and when he was about nine years old, MC saw domestic violence again when her boyfriend attacked her, leaving her bruised.

The State presented testimony by Lieutenant Detective Makayla Jenkins with the Stuttgart Police Department who responded to the scene of the shooting that occurred on January 4, 2024. She testified that the victim was lying on the front lawn of a residence with two or more serious gunshot wounds. Jenkins said that, although there were two people inside the residence, they did not witness the shooting. She said that the victim, however, identified MC as the shooter. Jenkins testified that MC claimed that the victim had cursed at Taylor an hour or so before the shooting. She said that MC also told her that his stepfather, "Draco," had been at the scene but that she had not located the stepfather to question him.

Next, Jalicia Wyatt, an Arkansas County Juvenile Officer, testified that she oversees diversions, family-in-need-of-services (FINS) cases, and probation and that she assigns services that may benefit juveniles. Wyatt stated that she had met with MC on multiple occasions, and she testified about his compliance with past programs. Wyatt said that she had also met

with MC at his school for "redirection" a couple of times. She testified that MC had been charged with criminal mischief in March 2022 and that he had been ordered to perform community service, write an essay, and attend a boxing program. She said that he was charged with terroristic threatening in May 2023 related to texted threats at a library. Wyatt testified that MC received probation and was ordered to participate in Life Skills; Boys' Circle, a gun-violence class; an anger-management class; and CSTP. She described MC's compliance with Life Skills as "off and on"; she said that he did not start Boys' Circle; and she testified that he did not complete the anger-management class. Wyatt conceded that MC's failure to complete the programs could be due to both his failure to attend of his own accord and his having no adult to transport him to the programs. Wyatt testified that MC did complete the gun-violence class and CSTP, which involves a highly structured and restrictive environment. She said that he could "possibly" benefit from another structured program—even DYS incarceration—but that she was concerned with whether he could follow that structure when he returned to his environment. Wyatt was asked whether MC could be rehabilitated through DYS services, and she said only "possibly," conditioned on whether he "applie[d] himself]" and "[took] in the information." She noted, however, that MC does not follow directions and "[will] still try to find a way to do what he want[s] to do." Wyatt also said that the fact that MC did not fully participate in services meant that he did not fully benefit from them.

After the hearing, the trial court made the following findings in a letter opinion attached to an order denying MC's motion to transfer to the juvenile division of circuit court or, alternatively, for extended juvenile jurisdiction designation:

1. *The seriousness of the alleged event and whether the protection of society requires prosecution in the criminal division of Circuit Court;*
   The charges are 4 counts of Battery I with the use of a firearm and Attempted Murder. Aside from actual murder, the alleged crime cannot be any more serious. Moreover, the protection of society requires prosecution in the criminal division of the Circuit Court. The evidence presented a Defendant who has threatened others by words when he was 3 years old. The last threat resulted in attempted murder and battery. Furthermore, the Defendant will continue to be a threat and danger to society due to his inability to be rehabilitated from years of therapy and programs as the Defendant does not follow directions and was characterized as an individual who will do what he wants to do.

2. *Whether the offense was committed in an aggressive, violent, premeditated, or willful manner;*
   A firearm was used in the commission of the offense which is in and of itself aggressive and violent. To commit this crime, the actions leading up to the crime were deliberate and intentional. There was aforethought about where to get the firearm, how to get to the location to pick up the firearm, how to ensure bullets were in the gun, where to find the victim and how [to] pull the trigger.

3. *Whether the offense was against a person or property, with greater weight being given to offenses against persons, especially if personal injury resulted;*
   There is no question the victim was a person.

4. *The culpability of the juvenile, including the level of planning and participation in the alleged offense;*
   As previously stated, there was thought involved in the commission of this crime prior to the act of shooting. First, the Defendant had to locate a firearm either by asking or by knowing where a gun had been placed. Then the Defendant had to obtain the gun and ensure it was loaded. Next he had to know where the victim was going to be. Finally, he had to pull the trigger against a victim who did not have a weapon on him. The trigger was pulled at least twice from the evidence presented so even if one shot was accidental, a second would not be.

7

5. *The previous history of the juvenile, including whether the juvenile has been adjudicated a juvenile offender and, if so, whether the offenses were against persons or property, and any other previous history of antisocial behavior or patterns of physical violence;*
The Defendant's mother, Angela Taylor, testified that her son had been diagnosed with an "Aggressive Behavioral Disorder" at the age of 3 after he threatened his "school." She took him to Pinnacle Point where he started attending therapy and was placed on medication. He stopped taking his meds about 7 years ago. He stayed in therapy until 6th grade, which is when Pinnacle Point closed the Arkansas County office. Although he was not a victim to physical violence, he did witness Ms. Taylor being a victim on 2 occasions. He was 5 years old at the first occurrence.

The Arkansas County juvenile officer, Jalicia Wyatt, became acquainted with the Defendant when he was charged with criminal mischief in 2022. Ms. Wyatt met with the Defendant a couple of times at school. He was ordered to attend the county boxing program. In May of 2023, the Defendant was charged with Terroristic Threatening. He was placed on probation and ordered to attend anger management, Boys' Circle and Life Skills. He did not complete these programs. He was also ordered to attend CSTP in August of 2023 which he completed. Subsequently, because he had some gang involvement and gun violence was a concern, he took a Gun Violence course facilitated by United Family Services. He completed that course less than one month before the January 4, 2024, shooting incident happened.

6. *The sophistication or maturity of the juvenile as determined by consideration of the juvenile's home, environment, emotional attitude, pattern of living, or desire to be treated as an adult;*
The Defendant had passing grades at school. He did not have a job. Ms. Taylor said he acted like a normal teenager. However, his mother also indicated that he would go out at night even though she told him not to do so. Therefore, he was mature enough, despite his mother not wanting him to be out "on the streets at night" and "hang with the wrong crowd," to defy her and do what he wanted to do. He was also mature enough to think it was acceptable behavior to get in-school suspension despite knowing the proper way to act in the classroom, and he was mature enough to go to the next level with his aggression and obtain a gun.

7. *Whether there are facilities or programs available to the judge of the juvenile division of Circuit Court that are likely to rehabilitate the juvenile before the expiration of the juvenile's twenty-first birthday;*
The Defendant completed the Guns and Violence program less than one month prior to this shooting incident. Brooke Digby, ombudsman for the State and

8

advocate for DYS juveniles, was not aware of a Guns and Violence II program. She suggested he complete an anger management course or possibly to implement more structure in the home. Ms. Wyatt stated that even after the programs and therapy, the Defendant does what he wants to do and that he does not follow directions. The Defendant has proven to continue doing what he wants to do despite others attempting to discipline him (his mother) or to rehabilitate him (Arkansas County Juvenile Probation Office, Pinnacle Point, CSTP, therapy, teachers, counselors).

8. *Whether the juvenile acted alone or was part of a group in the commission of the alleged offense*;
   There was not any evidence presented that the Defendant acted as part of a group.

9. *Written reports and other materials relating to the juvenile's physical, educational, and societal history; and*
   Other than testimony with regard to the aggressive disorder diagnosis, passing grades and peer pressure issues of the Defendant, there were not any reports that were admitted into evidence.

10. *Any other factors deemed relevant by the judge.*
    The Defendant was 14 years old at the time of the alleged crime. It is always the goal to rehabilitate our young people to create productive members of society. In this case, however, with an anti-social history since he was 3 years old (2 years before the first domestic violence incident to his mother) and years of therapy and medicines, the Defendant has continued to resist help and has even rebelled to the point of taking matters into his own hands using a firearm. Attempted murder and battery with the use of a firearm are crimes that rise to a level beyond what rehabilitation can do and certainly DYS since it does not have a program to fit the needs of the Defendant, only possibilities. Protection of the community is of the utmost. This act was pre-meditated and thought-out. Peer pressure is not going to change, and the only way difficult home environments change is with plans to make those changes, and I heard none.

    Defense counsel cited [*Minor Child v. State*, 2024 Ark. App. 393, 701 S.W.3d 751], and claimed that the factors considered for transfer weighed heavily in favor of a transfer to juvenile court. However, [*Id.*] is distinguished from the present case in that it dealt with a 15 year old teenager, without a criminal history, who began living with an abusive boyfriend. After discovering she was pregnant, she took an abortion pill and delivered a baby that lived for 10 minutes. She gave the baby to her boyfriend and told him to "do the rest." She was charged with Abuse of a Corpse which is a very different crime with a different purpose of protecting the

9

feelings of the deceased person's family. Evidence of planning to terminate a pregnancy is not the same as evidence to abuse a corpse. The girl argued she was not aware of what her boyfriend did with the baby's body. This case was not an act of pre-meditation where the use of a firearm or other weapon was used against another person or where aggression had been attempted to be treated in the past. Additionally, there was no evidence presented on how the abuse of a corpse affected protection of society.

## III. *Discussion*

MC begins by calling *Minor Child v. State*, 2024 Ark. App. 393, 701 S.W.3d 751, "now the leading case concerning juvenile transfer hearings" and says it is directly applicable here and supports MC's motion to transfer. The trial court aptly distinguished the case, and we take this opportunity to stress that *Minor Child* should not be read to mean that an appellate court may decide juvenile-transfer cases anew. There is no requirement that proof be introduced against the juvenile on each factor, and the trial court is not obligated to give equal weight to each of these factors in determining whether a case should be transferred. *D.D.R. v. State*, 2012 Ark. App. 329, 420 S.W.3d 494. Moreover, we do not attempt to pass on the credibility of witnesses. *Casillas v. State*, 2025 Ark. App. 117, 708 S.W.3d 90.

MC argues that the charges themselves satisfy the first three factors but that there is scant evidence pointing to his culpability, which is the fourth factor. He maintains that the fourth factor should have weighed far more significantly against the other three factors. MC points out that there is no affidavit of probable cause in the record, which would have outlined the alleged facts of the offense. He argues that, although judicial review of the factual predicate supporting a prosecutor's allegations is not required, a juvenile-transfer

hearing demands such review because his culpability is a factor taken into consideration. MC contends that the question of whether he actually committed the offenses is relevant.

MC does not challenge the findings related to the first three factors. The serious and violent nature of an offense, when there is some showing of proof to substantiate the charges, is sufficient by itself for trying a juvenile as an adult. *Carroll v. State*, 326 Ark. 882, 934 S.W.2d 523 (1996); *Lewis v. State*, 2020 Ark. App. 123, 596 S.W.3d 43. We have said that not even a showing of probable cause is required at a juvenile-transfer hearing. *State v. Graydon*, 86 Ark. App. 319, 184 S.W.3d 476 (2004). Moreover, the purpose of a juvenile-transfer hearing is not to determine probable cause, much less to determine one's guilt or innocence. *See Brown v. State*, 330 Ark. 603, 607, 954 S.W.2d 273, 275 (1997). Although MC asserts that there is *no evidence* tying him to the shooting, Jenkins testified that the victim identified MC as the person who had shot him, and there was no objection to this testimony. The trial court pointed out that MC put thought into obtaining the weapon and pulling the trigger and found that he did not shoot the victim accidentally given the number of times the victim was shot. We find no clear error in the trial court's finding as to the fourth factor.

Regarding the fifth factor, MC argues that his history shows a troubled teenager who has struggled with a mental-health condition. MC argues that, while his mother tried to seek treatment for him, he was not consistently medicated and did not regularly attend therapy. He points out that Pinnacle Point moved out of Arkansas County, which left him with no services and no one to address his obvious mental-health crisis—his mother was overwhelmed trying to support the family, and his father was absent. MC asserts that the adults in his life

11

failed him and that this factor actually supports the transfer so that adults can again step in to help him with his mental-health concerns. Also, MC maintains that he failed to complete all of the services offered because he was only fourteen and could not drive.

The trial court heard testimony about MC's mental-health issues, although it did not make extensive findings in that regard. The trial court also heard about and made findings on MC's compliance with services. The trial court also considered that MC was diagnosed as aggressive at the age of three when he threatened his Head Start school; MC witnessed domestic violence at a young age; and MC was charged with criminal mischief in March 2022 and with terroristic threatening in May 2023. We hold that the trial court did not clearly err in its findings as to the fifth factor.

Regarding the sixth factor, MC points out that he was only fourteen years old and lacking in sophistication and maturity. He asserts that the fact that he would defy his mother by going out at night shows his lack of maturity and that his in-school suspension shows that he was not rationally weighing positives and negatives before acting out at school. MC argues that his teenage brain was not fully formed and that the trial court should not have given this factor much weight. Again, we do not reweigh the evidence. *D.D.R.*, *supra*. Although Taylor said that MC acted like a normal teenager, he defied his mother and went out at night, which reflects his desire to be treated as an adult. Apparently, Taylor did not approve of his friends, yet MC continued to associate with them at all hours. This shows that MC made his own decisions and did what he wanted to do. We hold that the trial court did not clearly err with respect to the sixth factor.

Regarding the seventh factor, MC contends that, instead of considering the facilities and programs available, the trial court highlighted the few programs that he had already attempted and either failed to complete or those that did not appear to have helped him. MC argues that the trial court was supposed to have considered whether programs could still rehabilitate him, and he points to Digby's testimony about available programs. MC asserts that this evidence was summarily dismissed and that the trial court "wrongly weighted this factor" because programs existed that could have helped rehabilitate him. Here, MC completed a gun-violence class, yet one month later, he shot the victim four times and could have killed him. Digby could not answer the prosecutor's question about whether there was an advanced course for MC to complete given that the first one "didn't take." Although Digby mentioned having MC take an anger-management class, MC had already been offered that class, and he failed to complete it. We cannot say that the trial court clearly erred in considering this factor.

As for the eighth factor, MC argues that the trial court offered one sentence but that there was evidence that he was associating with some other juveniles that may have referred to themselves as a gang. He argues that this factor should have been neutral at best. The trial court mentioned MC's potential involvement with a gang, although it was in reference to a different factor. There was no evidence that the victim's shooting was gang related, and Wyatt testified that she was uncertain whether MC was still affiliated with a particular gang, so we cannot say that the trial court clearly erred in its consideration of this factor.

MC does not challenge the trial court's finding with respect to the ninth factor. The trial court noted that there were no written reports or other materials introduced at the hearing. As for the tenth factor, MC argues that the trial court merely summarized its findings to bolster its denial of his transfer motion and used the factor to refute the applicability of *Minor Child v. State*, 2024 Ark. App. 393, 701 S.W.3d 750. He argues that there were many other factors the trial court could have considered but that the trial court overlooked much that was discussed at the hearing. MC contends that, had the trial court properly considered this factor, it could have summarized the facts that highlighted the extreme disadvantages to which he was exposed, which would have weighed in his favor. There is no indication that the trial court "overlooked" any information brought out at the transfer hearing. With this factor, the trial court can bring up anything it deems relevant. We cannot say that the trial court clearly erred in not making findings that MC deemed relevant.

Affirmed in part; dismissed in part.

HIXSON and BROWN, JJ., agree.

*Brent P. Gasper*, Arkansas Public Defender Commission, for appellant.

*Tim Griffin*, Att'y Gen., by: *James Hill*, Ass't Att'y Gen., for appellee.